IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| WEST SIDE SALVAGE, INC.,<br><br>        Plaintiff,<br><br>vs.<br><br>RSUI INDEMNITY COMPANY,<br><br>        Defendant. | Case No. _____<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff West Side Salvage, Inc., for its Complaint against Defendant RSUI Indemnity Company, states:

**PARTIES AND JURISDICTION**

1. Plaintiff West Side Salvage, Inc. ("West Side") is, and was at all times material to this action, an Iowa corporation with its principal place of business in Benton County, Iowa.

2. Defendant RSUI Indemnity Company ("RSUI") is a corporation organized and existing under the laws of New Hampshire, with its principal place of business in Atlanta, Georgia, and is engaged in the business of writing policies of insurance, including in the state of Iowa.

3. There is complete diversity of the parties to this action because RSUI and West Side are incorporated in and have their principal places of business in different states from one another.

4. The amount in controversy exceeds $75,000.00, exclusive of costs and interest. Therefore, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

5. Venue for this action is proper in the Southern District of Illinois, East St. Louis Division, pursuant to 28 U.S.C. § 1391, because a substantial part of the acts and omissions

giving rise to these claims occurred in this district and division, as set forth in additional detail below.

## SUMMARY OF CLAIM

This is an action by West Side against RSUI, which provided excess liability coverage to West Side, for RSUI's bad faith refusal to negotiate and settle claims brought against West Side in this Court. This conduct, described in greater detail below, occurred before and primarily during a jury trial on these claims that was held in this Court between May 8, 2012 and June 1, 2012. As a result of the refusal of RSUI to negotiate and to offer its policy limits in settlement of those claims, judgments have been entered against West Side that exceed available liability coverage by over twelve million dollars.

## INSURANCE POLICIES

6. At all relevant times, Colony National Insurance Company ("Colony") insured West Side for losses, such as those incurred in and as a result of the Underlying Litigation (defined below). A copy of the Colony insurance policy is attached hereto as Exhibit A.

7. Colony issued policy number AR5360230 to West Side, for the policy period from March 1, 2010 to March 1, 2011, designating West Side as a Named Insured and with limits applicable to the claims against West Side in the Underlying Litigation of one million dollars per occurrence.

8. At all relevant times, RSUI insured West Side for losses, such as those incurred in and as a result of the Underlying Litigation, in excess of the Colony policy limits.

9. The Policy at issue in this instant action is RSUI POLICY NUMBER NHA052096 (the "RSUI Policy"). A copy of the RSUI Policy is attached hereto as Exhibit B.

10. The RSUI Policy covered the policy period from March 1, 2010 to March 1, 2011 and included the following limits:

| EACH OCCURRENCE | AGGREGATE WHERE APPLICABLE |
|---|---|
| $11,000,000 | $11,000,000 |

11. The applicable combined limits for West Side under the Colony and RSUI policies were twelve million dollars.

## UNDERLYING LITIGATION

12. On or about April 19, 2010, ConAgra Foods, Inc. ("ConAgra") hired West Side to clean out a grain bin at its plant in Chester, Illinois.

13. West Side thereafter sub-contracted with A&J Bin Cleaning, LLC ("A&J") to assist with the cleaning out of the bin.

14. On April 27, 2010, John Jentz ("Jentz") and Robert Schmidt ("Schmidt") were employees of A&J and Justin Becker ("Becker") was an employee of West Side.

15. At approximately 4:00 p.m. on April 27, 2010, an explosion occurred in ConAgra bin C-15 and Jentz, Schmidt and Becker were injured.

16. On June 30, 2010, Jentz filed a Complaint in the United States District Court for the Southern District of Illinois, East St. Louis Division asserting claims of Negligence and Res Ipsa Loquitur against ConAgra (case number 3:10-cv-00474). On November 9, 2010, ConAgra filed its Third-Party Complaint against A&J and its cross-claim against West Side, asserting claims of Common Law Indemnification and Negligence against West Side with regard to the Jentz claims.

17. On November 23, 2010, Becker filed a Complaint in the United States District Court for the Southern District of Illinois, East St. Louis Division, asserting claims of Negligence, Res Ipsa Loquitur, Restatement Section 414 Negligence, and Premises Liability

against ConAgra (case number 3:10-cv-00952). On February 4, 2011, ConAgra filed its Third-Party Complaint against West Side and A&J with regard to the Becker claims. Mr. Becker's wife, Amber Becker, was later added as a plaintiff.

18. On May 11, 2011, Schmidt filed a Complaint in the United States District Court for the Southern District of Illinois, East St. Louis Division against ConAgra and asserting claims of Negligence and Res Ipsa Loquitur against West Side (case number 3:11-cv-00391). On July 13, 2011, ConAgra filed its Crossclaim against West Side and Third-Party Complaint against A&J regarding the Schmidt claims.

19. On December 22, 2011, the Becker and Schmidt matters were consolidated into the Jentz litigation (collectively referred to herein as the "Underlying Litigation").

20. Throughout the prosecution of the Underlying Litigation, the various parties amended their claims and/or defenses.

21. A 17-day jury trial commenced in the Underlying Litigation on May 8, 2012.

22. Following trial and entries of jury verdicts, judgments were entered against West Side and in favor of Jentz and Schmidt for personal injuries in the aggregate amount of twenty-one million dollars, and in favor of Con Agra and against West Side for property damage in the amount of three million dollars. Judgment also was entered for both West Side and ConAgra on their cross claims against each other for any amounts they may be required to pay the plaintiffs in the Underlying Litigation beyond the judgments entered against each defendant. The judgments are currently being appealed to the United States Court of Appeals for the Seventh Circuit.

23. On or about March 8, 2013, a portion of the judgments in the Underlying Litigation was registered against West Side in Benton County, Iowa, where the principal place of business of West Side is located.

## **OPPORTUNITY TO SETTLE**

24. Before trial of the Underlying Litigation, West Side's underlying insurer, Colony, tendered its applicable limits of one million dollars. Colony reiterated that tender several times during trial.

25. As a result of Colony's tender, the burden of settlement of the claims against West Side fell to RSUI.

26. West Side was represented in the Underlying Litigation by the firm of Franke Schultz and Mullen, P.C., with John Schultz as lead trial counsel. Mr. Schultz and his firm were retained by Colony on behalf of West Side.

27. Plaintiffs Jentz and Schmidt were represented by Clifford Law Offices, P.C., and Robert Clifford was their lead trial counsel.

28. Plaintiff Justin Becker was an employee of West Side, whose claims against West Side were limited under workers' compensation statutes, and therefore neither he nor his wife, plaintiff Amber Becker, had claims in the Underlying Litigation against West Side.

29. ConAgra had also filed cross claims against West Side relating to the personal injury claims of the plaintiffs, as well as a direct contract claim against West Side relating to property damage suffered by ConAgra in the explosion.

30. ConAgra was insured by ACE North American Claims ("ACE").

31. Kevin Visser, an attorney in Cedar Rapids, Iowa, was retained by West Side and acted on its behalf in certain settlement and coverage communications with RSUI, as discussed below.

32. RSUI did not have its own employees attend the trial in order to monitor the proceedings but instead sent attorney Natalie Limber as its representative and agent. Ms. Limber attended the trial and acted as the contact person for RSUI with West Side and its attorneys.

33. Prior to the trial, a mediation was held among all of the parties. The mediation was held in this Court. At that mediation, a joint demand was made from the Jentz and Schmidt plaintiffs that fell within the applicable combined limits of insurance of ConAgra and West Side. In response, RSUI failed to offer its limits of insurance, thereby depriving West Side of the opportunity to learn how the joint demand would have been apportioned had RSUI offered its limits, and whether that would have been sufficient to allow a full settlement of the plaintiffs' claims against West Side.

34. Despite the magnitude of the claims asserted against West Side, RSUI engaged in virtually no settlement discussions with any parties from the time of the mediation until trial commenced on May 8, 2012.

35. During trial, Robert Clifford, lead counsel for plaintiffs Jentz and Schmidt, the two plaintiffs with personal injury claims directly against West Side, informed both John Schultz and Natalie Limber that Jentz and Schmidt were willing to settle with West Side for West Side's full policy limits of twelve million dollars. While Mr. Clifford stated that RSUI must agree to pay its policy limits before plaintiffs' counsel would address the details of how such a settlement would be structured, he unequivocally indicated his willingness to enter into a policy limits

6

settlement with West Side, with the details to be worked out upon RSUI agreeing to tender those policy limits. RSUI never offered its policy limits in response to that demand.

36. Based upon the above described demands and communications, RSUI was aware of the opportunity to settle the plaintiffs' claims within the applicable policy limits.

37. During the same time period, and even earlier, ConAgra had also expressed its willingness to settle with West Side if RSUI would tender its full policy limits to plaintiffs Jentz and Schmidt. On May 18, 2012, Kim Moody, the representative of ConAgra's insurer, ACE, wrote to Natalie Limber proposing two bases for settling with West Side if RSUI would add its eleven million dollar limits to the one million dollar limits already offered by Colony, on behalf of West Side to Jentz and Schmidt, and reserving any workers' compensation/employee related lien claim that might be covered by other insurance. RSUI rejected that proposal without counter offer.

38. On May 22, 2012, attorney Siobhan Murphy, on behalf of ACE and ConAgra, again wrote to Natalie Limber proposing to settle within RSUI's limits and stating that ConAgra and ACE were willing to enter into a settlement with West Side that would eliminate all exposure to West Side beyond that covered by any other applicable insurance coverage for West Side, including workers' compensation coverage.

39. On or about May 24, 2012, Natalie Limber responded to Siobhan Murphy by rejecting the ConAgra/ACE proposal and refusing to offer its limits unconditionally, and instead issuing a counter proposal that involved RSUI agreeing to split with ConAgra/ACE a settlement with the Jentz and Schmidt plaintiffs on a 50/50 basis, up to RSUI's limits.

40. Even after the verdict and judgment were entered against West Side, in an amount far in excess of its policy limits, RSUI continued to refuse to tender its limits toward satisfaction

7

of that judgment, without West Side releasing RSUI from further claims through what RSUI characterized as a "policy holder's release".

41. The totality of settlement discussions that took place in the Underlying Litigation, particularly during trial, examples of which have been set forth above, demonstrates that RSUI had the opportunity to settle the Underlying Litigation with regard to West Side within its policy limits and that RSUI unreasonably failed to do so.

**RSUI'S IRRESPONSIBLE HANDLING OF SETTLEMENT NEGOTIATIONS**

42. RSUI never made a settlement offer to the plaintiffs in the Underlying Litigation.

43. The majority of discussions regarding settlement, either between the opposing parties, or between West Side representatives and RSUI representatives, took place during the course of the trial itself, and among the various representatives, including Ms. Limber, who were attending the trial.

44. During the course of the trial, it became apparent that it was substantially likely that a verdict would be entered against West Side that would be in excess of its twelve million dollar policy limits.

45. West Side's trial counsel, John Schultz, as of the time of trial, had been a practicing attorney for approximately twenty-five years and had tried approximately one hundred and fifty jury trials. Mr. Schultz concluded during the course of the trial, in considering both liability and damages, that there was a substantial likelihood of entry of a verdict against West Side in excess of its applicable insurance limits. Mr. Schultz communicated that conclusion to Ms. Limber during trial, and insisted on behalf of West Side that RSUI tender its limits to protect West Side's interests.

46. In addition to Mr. Schultz' demands, Mr. Visser, on behalf of West Side, repeatedly insisted both orally and in writing, that RSUI tender its limits to protect the interests of West Side.

47. Mr. Schultz and Mr. Visser repeated their demands that RSUI tender its limits in response to the specific demands from Attorney Clifford and ConAgra/ACE, including those set forth above, that demonstrated the Underlying Litigation could have been settled for West Side within West Side's applicable limits of insurance.

48. RSUI unreasonably and irresponsibly refused, in the face of all demands, to tender its limits in settlement of the Underlying Litigation. Instead, RSUI and its agent, Ms. Limber, specifically, fixated inappropriately on what RSUI may have to pay in comparison to what ACE would pay on behalf of ConAgra in settlement of the Underlying Litigation. That irresponsible fixation was fueled in part by personality conflicts and personal antagonism between Natalie Limber and ACE's representative at trial, Kim Moody, including those described below. Those conflicts prevented the RSUI and ACE representatives from meaningfully communicating with each other and interfered with and even prevented actions that Ms. Limber, on behalf of RSUI, should have been taking to protect the interests of West Side.

49. RSUI was obligated to approach settlement communications without regard to its limits and to consider settlement issues as if limits did not exist. Instead, RSUI focused exclusively on its own limits. In the final week of trial, after Mr. Schultz had repeatedly informed Ms. Limber that it was essential for RSUI to offer its limits in order to eliminate West Side's obvious excess exposure, Ms. Limber told West Side's president, Gene Schwers, that if RSUI had to pay its limits, Ms. Limber would "puke."

50. Several times, in response to statements of Mr. Schultz to Ms. Limber that it was critical for RSUI to tender its limits, Ms. Limber would state that she had placed a phone call in to RSUI to receive more authority. In Ms. Limber's discussions with Mr. Schultz regarding settlement, Ms. Limber always keyed actions taken on behalf of RSUI to what ACE would contribute towards settlement on behalf of ConAgra. Mr. Schultz went so far as to specifically warn Ms. Limber that RSUI needed to stop worrying about what ACE did, and to focus solely on looking out for the interests of West Side. RSUI made no adjustment in its position in response to this clear admonition.

51. RSUI took no reasonable or proactive steps to seek settlement of the Underlying Litigation on behalf of West Side. RSUI's communications, whether orally or in writing, reflected an irresponsible and shocking passivity, constantly waiting for someone to bring RSUI a proposal, criticizing other settlement proposals that were advanced, and making no corresponding specific proposals for settlement. RSUI, through Ms. Limber, actually took steps to chill settlement communications, by demanding that trial counsel, Mr. Schultz, have no further involvement in settlement communications and have no communications with ConAgra's attorneys regarding settlement. At a break during the trial, Ms. Limber confronted Mr. Schultz and informed him that his job was to try the case, and that she alone would be involved in settlement communications and that he was to have no further communications with counsel for the other parties seeking to advance settlement discussions.

## **BAD FAITH**

52. Plaintiff re-alleges and incorporates by this reference the statements contained in paragraphs 1-51 herein.

53. West Side was at all times material to this action insured under a policy of insurance issued by RSUI. The RSUI Policy covered West Side for matters alleged in the Underlying Litigation, and West Side had complied with all obligations imposed upon it by that RSUI Policy.

54. The claims filed against West Side in the above-described Underlying Litigation could have been settled within RSUI's limits of insurance.

55. West Side demanded of RSUI that it settle on West Side's behalf within the limits of insurance of RSUI.

56. Following RSUI's failure to settle the case within its policy limits, a verdict was entered against West Side substantially in excess of its applicable limits of insurance.

57. RSUI unreasonably, irresponsibly and negligently failed to settle the claims pending against West Side, when it could do so within the limits of its insurance, even after evidence presented at trial against West Side made it clear that there was a substantial likelihood of a verdict being entered in excess of West Side's limits of insurance.

58. RSUI rejected the advice of trial counsel, John Schultz, that there was a substantial likelihood of an excess verdict, and that RSUI should pay its policy limits to settle the claims pending against West Side.

59. To the extent that RSUI rejected any recommendations from Ms. Limber for the settlement of the Underlying Litigation then it also rejected the advice of its coverage/trial monitoring counsel.

60. RSUI failed to give equal consideration to the rights and interests of West Side in comparison to RSUI's rights and interest.

61. RSUI failed to take reasonable steps to initiate settlement discussions and to respond reasonably to settlement proposals made by other parties in the Underlying Litigation.

62. RSUI chilled settlement communications through its failure to make reasonable replies to settlement communications advanced by other parties in the Underlying Litigation, through its unreasonable failure to offer settlement proposals including tendering its policy limits, and by its specific directive to Mr. Schultz that he cease engaging in settlement communications.

63. RSUI failed to assess settlement without regard to its limits of insurance.

64. RSUI's policy provided "we [RSUI] will have no obligation under this insurance with respect to any claim or suit that is settled without our consent". This contractual provision carried with it a covenant of good faith and fair dealing that such consent would not be unreasonably withheld, and that RSUI would conduct itself in good faith in connection with settlement matters. RSUI violated that covenant of good faith and fair dealing through its unreasonable, irresponsible, negligent and bad faith handling of settlement communications and evaluations.

65. RSUI was obligated to act in good faith to maximize the protection it could give to West Side by use of the limits of insurance available to RSUI and to control the aspects of settlement that it could control. Among those obligations, regardless of what ConAgra or ACE was willing to contribute toward a settlement, RSUI could have offered its limits in exchange for resolving the claims pending against West Side, and without conditioning such offer on any amounts contributed by ConAgra, ACE or any other party. RSUI acted in bad faith in refusing to make such an offer.

66. RSUI's conduct in handling settlement in the Underlying Litigation violated the duties and standard of care owed to West Side pursuant to Iowa Code §507B.4 and, specifically, Iowa Code §507B.4(3)(j). That violation is evidence of bad faith.

67. RSUI knew and reasonably should have known that it had no reasonable basis for refusing to settle the claims pending against West Side within RSUI's limits.

68. RSUI's bad faith was a proximate cause of damage to West Side, including but not limited to damages from judgment being entered against it in excess of its policy limits, impairment of its property as a result of entry of the judgment, attorney fees necessitated by the bad-faith conduct of RSUI, damage to the business and reputation of West Side as a result of entry of the judgment against it, and other damages that occurred and will occur as a consequence of entry of that judgment.

69. RSUI's actions and inactions were done with malice, recklessness, indifference and gross negligence towards West Side, justifying an award of punitive damages against RSUI, and an award to reimburse West Side for its attorney fees incurred in the course of prosecuting this action.

WHEREFORE, Plaintiff West Side Salvage, Inc. respectfully requests that this Court enter a judgment against Defendant RSUI Indemnity Company for all remedies that are available as a result of RSUI's failure to settle the Underlying Litigation, including its bad faith in that regard, and that such damages include but not be limited to a judgment that RSUI is obligated to pay any and all amounts recoverable from West Side in the Underlying Litigation, attorney fees and expenses West Side has incurred in the prosecution of this action, punitive damages, damages West Side has incurred as a result of having a substantial judgment entered against it, interest, declaratory relief as necessary to fully provide the relief requested in this prayer, and

any and all other amounts or relief necessary to fully and fairly compensate West Side for its losses incurred as a result of RSUI's conduct.

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38 (b), Plaintiff hereby demands a trial by jury of all issues triable to a jury.

/s/ Matthew L. Preston
Matthew L. Preston,
**BRADY & O'SHEA, P.C.**
2735 1st Avenue S.E.
Cedar Rapids, IA 52402
Phone: 319/866-9277
Fax: 319/866-9280
mpreston@bradyoshea.com

**ATTORNEY FOR PLAINTIFF**